[Crim. No. 3639.   Second Dist., Div. Three.   Feb. 26, 1943.]

THE PEOPLE, Respondent, v. JOHN YACHIMOWICZ, Appellant.

Walter L. Gordon, Jr., for Appellant.

Earl Warren, Attorney General, and Eugene M. Elson, Deputy Attorney General, for Respondent.

DESMOND, P. J.—The defendant was charged in an amended information filed in the superior court with three offenses, burglary, grand theft and receiving stolen property. Count I, charging burglary, was dismissed ''in the interest of justice,'' and upon a jury-waived trial he was found ''not guilty'' of receiving stolen property and ''guilty'' of the crime of grand theft, for which offense he was sentenced to imprisonment in the state prison for the term prescribed by law. He appeals from the judgment and from an order denying a new trial and contends, first, that there was a material variance in the property described in the information and the proof; second, that no corpus delicti of the crime of grand theft was established to admit the confession; third, that the court committed prejudicial error in the admission of evidence; and fourth, that the decision was contrary to law and that the evidence produced was insufficient to sustain the conviction.

At the trial it was stipulated that the case might be submitted on the transcript of testimony taken at the preliminary hearing, with the proviso that either side might produce additional testimony before the superior court. The defendant did not avail himself of the opportunity to produce witnesses

at any time, either at the preliminary hearing or in the superior court, nor did he appear as a witness in his own behalf.

Among the witnesses produced by the prosecution was a deputy sheriff of Los Angeles County named Chaillie, who arrested the appellant on February 25, 1942, near Lancaster, California. He and another deputy had gone to that neighborhood looking for the defendant and met him as he came around the corner of a house where they were inquiring for him. He told the officers that his name was John Yachimowicz and stated that he had been "digging out the spring." The officer testified that he had previously viewed the path leading up to the spring and had seen no footprints there. He informed the defendant that he was under arrest and "backtracked" his footprints. At a point about a hundred yards from the house the officer noticed some freshly turned dirt and upon digging there found four small cardboard boxes, two of them card index files containing papers upon which were printed Union Hardware and Metal Company's headings. Upon showing these boxes to the defendant and asking him what he meant by burying them, the defendant merely stated that he had nothing to say; that he was not going to talk. The officers after a thorough search of the premises returned to Los Angeles and the defendant there stated in the presence of several witnesses that he had been employed by the Union Hardware and Metal Company for about seven years; that once or twice a week he was a night watchman; that on such occasions he would drive his car into the garage which was part of the building housing the Union Hardware and Metal Company, and as he made his rounds would accumulate from the stock various items for which he thought a sale might be found; that in the early morning before anyone else arrived, he would pull his car out on the street and around the corner and upon leaving his employment would drive his car over to the home of Mrs. Craine where he had a room built to store his goods, or to the place in Antelope Valley where he would store his goods. Upon being asked what he took at any one time the defendant answered that he had no way of knowing; he did not know what he took; he just took it all. He said at various times the items would range from safety pins to outboard motors and that he had no definite recollection as to when he took the guns or how many guns he took, but that everything he had was taken from the Union Hardware and Metal Company;

that he previously had been employed as an assistant buyer and had been demoted and his salary cut; and that he had "been given a raw deal" and that was why he started stealing from them.

Another deputy sheriff named Weiner, one of the investigating officers, testified that he saw five guns introduced in evidence at the preliminary hearing, and it was stipulated between counsel that they were put in evidence in factory cartons. This witness also testified that after the appellant was brought back to Los Angeles he stated that the records which were found buried by the officers "were his accounting system of the various merchandise that he had on what he called consignment to the various parties who were disposing of it for him." According to Weiner, the defendant "related his act of employment with the Union Hardware and Metal Company, and stated that he had become incensed at the treatment received from them, and decided to get even with them; that he had adopted the manner of loading up his car each night when he was working as night watchman, leaving with this various merchandise. In other words, he was stealing it from the store." This officer further testified that upon a search of the premises near Lancaster the officers "found a varied assortment of merchandise, ranging from all types of hardware, tools, electrical fixtures, silverware, sporting goods and jewelry, and every type of merchandise . . . in this house and in a little shed adjoining the house. The merchandise was all contained in wooden cartons and each carton was numbered and labeled. The numbers were found to correspond with the books . . . the merchandise in the house, itself, wasn't labeled. It was scattered around and contained in various cartons, and concealed in the furniture, in magazines and things of that nature. In the shed, however, the boxes were stacked and were all numbered, and the numbers corresponded with some of the numbers listed in here on the outside of these steel boxes. . . . He said that he had—made several acquaintances of people, and that he would inquire of them if they had any means of disposing of various items which he could give to them at a very low price, and which would enable them to resell them and make a profit on them. He said he had made two or three contacts with other parties who wanted to do that, that he had been furnishing the material to them, and they had been disposing of it."

It was stipulated that if another deputy named Pierson

were sworn, he would testify that he went to Lancaster to the house and shed, described by Weiner, and took the material stored there in a truck to the Union Hardware and Metal Company. It was further stipulated that the property recovered by the officers ''was appraised in the inventory in the sum of $15,000.00.''

Chaillie had gone to the premises of Mrs. Craine two days before his trip to Lancaster and had there picked up fifteen guns, which had been stored in appellant's room by one Trudell. Included in the lot were five guns which had been marked for indentification in the preliminary hearing and which were introduced as exhibits in the superior court, and were the same which Weiner saw at the time of the preliminary examination. Trudell testified that on February 22nd, he took over to Mrs. Craine's place about fifteen guns, which he had received from the appellant a few weeks previous; that the appellant at that time told him that he had purchased stock from bankrupt outfits and wanted to know whether Trudell would buy it or sell it for him. Trudell told him that he could leave the guns and if anyone appeared who might be interested he would advise the appellant. ▮ The five guns produced in court were identified by various employees of the Union Hardware and Metal Company as property which had been stolen from their employer. George Richmond, a buyer for that concern, testified that the fair market value of the five guns was $259.80 and that during all the period from January 1st, 1940, to the time of trial, the fair market value was in excess of $201. They were invoiced as Rifle #1219968, Rifle #1220718, Rifle #35133-A, Shotgun #802896, Rifle #24258. The amended information under which the defendant was convicted, however, did not charge him with the theft of any of these guns, the charge there referring to other weapons, four in number, described as follows: one 30/06 Winchester rifle, one 20 gauge Winchester gun, one 12 gauge Winchester gun, and one 410 gauge Winchester gun. None of these was offered in evidence. Upon this situation rests appellant's contention that there was a material variance between the charge of theft as laid and the proof. An examination of the record discloses that the point of alleged variance was not raised at the trial, nor, so far as appears, even on motion for new trial, if indeed it could have been raised then for the first time. The record discloses that the People had in their possession, apparently for possi-

ble use as evidence, some fifteen guns belonging to Union Hardware and Metal Company and which presumably were those which were shown to have been in the possession of defendant and to have been recovered from the premises of Mrs. Craine. It does not appear to have been noticed, at the preliminary examination, when the five rifles were placed in evidence, nor at the trial when they were identified, appraised and again placed in evidence that they were not the guns described in the amended information. If defendant was unaware of the alleged variance he was uninjured by it; if he was aware of it he should have made his objection, and having failed to do so he will be deemed to have waived it. (*People* v. *Rabe*, (1927) 202 Cal. 409 [261 P. 303]; *People* v. *Abila*, (1934) 137 Cal.App. 26 [29 P.2d 796]; *People* v. *Myers*, (1934) 1 Cal.App.2d 620 [37 P.2d 191]; *People* v. *Pryor*, (1936) 17 Cal.App.2d 147 [61 P.2d 773].) In the last named case the following appears (pp. 151, 152): "An objection to evidence on the ground of variance may ordinarily not be made for the first time on appeal. It is waived by failure to raise that objection at the trial. (*People* v. *Fuski*, 49 Cal.App. 4 [192 P. 552]; *People* v. *Woods*, 190 Cal. 513 [213 P. 951]; 8 Cal. Jur. 500, sec. 515.) In 8 California Jurisprudence last cited it is said in that regard:

" 'An objection to variance between the pleading and proof cannot be made for the first time upon appeal. And when the case is tried on the theory that certain issues are covered by the indictment it is too late to make the point upon appeal, where it does not appear that prejudice resulted to the defendant from any imperfections in the indictment.' "

We have no hesitation in applying this rule to the instant case. The description of the stolen property as it appeared in the information apparently resulted from confusion in the selection of a few guns to be identified from the many which defendant had stolen from the same owner.

In regard to the contention that the corpus delicti was not established in this case, we believe that the recital herein of the circumstances and statement under which the guns were delivered by the appellant to Trudell, and the testimony of the employees of the Union Hardware and Metal Company of the manner of their disappearance from the warehouse, together with a number of other incidents reported in the record, furnish a sufficient answer to the argument of the appellant that in the case at bar "there is no evidence of felonious intent to

steal the property which is an essential element of the offense of larceny. One is not guilty of larceny who believes he has a legal right to possession." We note at this point the statement made by the appellant to Officer Chaillie that "his employers had given him a raw deal and that is when he started stealing from them."

As to the contention that the court erred in the admission of evidence, having read the entire record in this case we find no basis for that complaint.

On the point that the evidence in the case is insufficient to sustain the judgment of conviction, it appears that the only matter warranting comment relates to the value of the property which the appellant was convicted of stealing. He argues that if each gun were taken on a separate day there would be no grand theft under any theory known to the law. It must be conceded that there was no direct evidence that all five guns, of the value of more than $200, were taken by the appellant at the same time, nor was there any direct evidence that they were taken one by one at different times. However, it is apparent that the entire plan of stealing resorted to by appellant was in furtherance of his design to secure personal and monetary satisfaction for his treatment at the hands of his employers. Upon the evidence received by the trial court and under the reasoning of *People* v. *Sing*, (1919) 42 Cal.App. 385 [183 P. 865], we feel that the defendant was justly convicted of the crime of grand theft. We quote from the language in that opinion, at page 396, as follows: "The law is that if different asportations from the same owner are prompted by one design, one purpose, one impulse, they are a single act, without regard to time." See, also, *People* v. *Fleming*, (1934) 220 Cal. 601, 611 [32 P.2d 593]; *People* v. *Dillon*, (1934) 1 Cal.App.2d 224, 229 [36 P.2d 416].

Judgment and order affirmed.

Shinn, J., and Shaw, J. pro tem., concurred.