Filed 3/7/16  P. v. Spears CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C078527 |
| Plaintiff and Respondent, | (Super. Ct. No. P12CRF0216) |
| v. | |
| BRIAN KEITH SPEARS, | |
| Defendant and Appellant. | |

Over a span of approximately 16 years and three counties, defendant Brian Keith Spears molested four girls.  A jury in El Dorado County found him guilty of crimes, which included eight counts of lewd acts and one count of continuous sexual abuse.  The El Dorado County Superior Court sentenced defendant to an indeterminate term of 240 years to life plus a consecutive and determinate term of 4 years and 4 months in prison. This sentence included terms under the one strike law and the three strikes law and an enhancement for a prior prison term, after the court accepted defendant's admission that he had a prior conviction.

1

On appeal, defendant raises 10 contentions related to the El Dorado court's jurisdiction, the evidence, jury instructions, and sentencing. Finding merit in only some of his sentencing contentions, we modify the sentence, remand the case for additional findings, order the trial court to correct the abstract of judgment, and affirm as modified.

FACTUAL AND PROCEDURAL HISTORY

I

*The Prosecution's Case*

A

*Background Facts*

Defendant married L.S. in 1994. Their older son was born in 1994. Their daughter, Doe 1, was born in 1998. Doe 1's biological father is defendant's brother, but defendant and L.S. raised Doe 1 since she was eight days old and she considered them her parents. Defendant and L.S.'s second son was born in 2003. Defendant and L.S. have lived in Humboldt County, in Kern County (Bakersfield), Texas, and El Dorado County (El Dorado Hills).

Defendant's molestation of Doe 1 first came to the attention of police when L.S. walked in on the final molestation in April 2012. Thereafter, more incidents came to light, including previous molestations of Doe 1, Doe 2 (who was defendant's niece), Doe 3 (who was a family friend of defendant), and Doe 4 (a foster teenager with whom defendant had an ongoing sexual relationship).

B

*Defendant's Crimes Against His Daughter, Doe 1*

When Doe 1 was six years old in about 2004, and the family was living in Bakersfield, defendant first started molesting her. Once late at night when L.S. was drunk, defendant took Doe 1 into the laundry room, touched Doe 1 on her vagina with his hand (count 2) and then penetrated Doe 1's buttocks with his penis (count 1). Another

time when defendant and Doe 1 were driving alone in a car in Bakersfield, defendant made Doe 1 put her mouth on his penis (count 3).

When Doe 1 was seven, the family moved to Texas, and "it started happening a lot more," including vaginal intercourse about three times a week.

The summer between Doe 1's sixth and seventh grade (summer 2011), the family moved to El Dorado Hills. She was 12. From thereon, defendant would have vaginal and oral sex with her a couple of times per week (count 4).

The last time defendant molested Doe 1 was April 2, 2012. Defendant came into her bedroom around 6:30 a.m., he put his mouth on her breasts, had vaginal intercourse with her (count 5), and licked her vagina (count 6). As this all was happening, L.S. came in the room and hysterically asked whether defendant had done anything to her. Doe 1 said, "yes." L.S. drove Doe 1 to the parking lot of a Safeway grocery store and police arrived.

Doe 1 was then taken to a hospital for an exam. DNA taken from a swab of Doe 1's left breast contained the enzyme amylase, which was indicative of saliva, and that amylase matched defendant's DNA. Police investigation revealed defendant may have molested other girls.

C

*Defendant's Crime Against His Niece, Doe 2*

Doe 2 is defendant's niece. During Thanksgiving 2011, Doe 2 (who was 13 years old at the time) was visiting defendant and L.S. in their El Dorado Hills house. Doe 2 was spending the night on the living room couch when a drunk L.S. came downstairs to talk with Doe 2. Defendant "got [L.] to go [back] upstairs" and told Doe 2 he would return downstairs to talk with her. When defendant returned, Doe 2 was asleep. He awakened her by grabbing her buttocks (count 7). She pushed defendant away and said, "No." She then locked herself in the bathroom, where she called her grandmother to take her home, which her grandmother did within 40 minutes.

3

D

*Defendant's Crimes Against Family Friend Doe 3 In Humboldt County*

Doe 3 stayed with defendant and L.S. when defendant and L.S. were living in Humboldt County in the summer of 1997. Doe 3 and her mother knew L.S. through their (Doe 3 and her mother's) landlady, who was related to defendant and L.S. At the time, Doe 3 was about 11 or 12 years old and about to begin sixth grade. Three times when Doe 3 was staying with defendant and L.S., defendant touched Doe 3. The first was when she was playing by herself on an exercise ball in the living room, and defendant just walked in, patted her on her buttocks, and walked out of the living room. Doe 3 "fe[lt] like it was inappropriate." The second time was when he walked back into the living room when she was still alone in the living room on an exercise ball, and he patted her again on the buttocks. The third time (which was separate from the first two), Doe 3 was on a mattress in the living room, where she had been sleeping while staying at their house. While Doe 3 was on the mattress, defendant "touch[ed] [her] . . . in [her] bottom area." From these three touchings, Doe 3 "remember[ed] the overall feeling of gross."[1]

E

*Defendant's Crimes Against Foster Child Doe 4 In Humboldt County*

Doe 4 met defendant through a friend of hers when she was a foster child living in Humboldt County. During that first meeting, which was in the spring of 1997 when she was 15 years old, she and defendant had sex at a hotel (count 9). She told defendant she was 15. Defendant's friend "Louis" was also there, as was her friend. Doe 4 had many more sexual encounters with defendant, "[m]ore . . . than [she] c[ould] count."

---

[1] The People charged defendant in count 8 with one lewd act against Doe 3, and the prosecutor explained to the jurors in closing argument that they all had to agree on one of these incidents to find defendant guilty of a lewd act.

4

## II

### *The Defense*

Defendant testified he did not molest Doe 1.  He did, however, tell Doe 1 to tell L.S. "yes" in response to L.S. questioning her during the last incident as to whether defendant had touched her.  He did that only so L.S. would calm down and allow them all to get some rest.  Doe 2 and Doe 3 were also lying when they testified he molested them.  Doe 4 was confused as to the timing of the intercourse.  He had sex with Doe 4, but it was when she was 17 or 18.

## DISCUSSION

### I

### *El Dorado County Superior Court Had Jurisdiction Over The Humboldt And Kern County Counts, And Defense Counsel Forfeited Any Objection Regarding A Lack Of Hearing On This Issue By Failing To Object Pretrial Or During Trial*

Defendant was charged and found guilty in El Dorado County of three crimes committed in Kern County and two crimes committed in Humboldt County.  Defendant contends the El Dorado County District Attorney's Office had no jurisdiction to try these five counts because it failed to comply with Penal Code section 784.7, subdivision (a) which allows joinder of charges occurring in another county if the People "present written evidence that all district attorneys in counties with jurisdiction of the offenses agree to the venue" at a pretrial hearing.  Here, defendant argues that since there was no such pretrial hearing at which the People presented this evidence, these five convictions "were null and should be vacated or reversed."  Defendant's claim is premised on his argument that "[w]hen a prosecutor fails to obtain consent of the district attorney in the county where the offenses occurred, the court has no jurisdiction to proceed."

Defendant is wrong that there was no jurisdiction to proceed because, as the record makes clear, the El Dorado prosecutor received the required consent and defense counsel was aware of this.  And, to the extent defendant claims reversible error because the court

5

did not hold a pretrial hearing, that contention is forfeited because defense counsel failed to object pretrial or even during the trial to the lack of hearing. We explain below.

The only time defense counsel objected to the lack of a pretrial hearing was after defendant had been found guilty on all counts. At that time, defense counsel filed a new trial motion noting that prior defense counsel (defendant hired new counsel after the guilty verdicts) had failed to object to the lack of a pretrial hearing. At the new trial hearing, the prosecutor presented the written approval from both Humboldt and Kern Counties that pretrial, they had agreed to El Dorado County as the venue to try all the charges. These documents were "discovered to the Defense." Thus, defendant's appellate argument that there was no jurisdiction to proceed with the trial is incorrect, as the El Dorado prosecutor had indeed secured the written approval pretrial and had notified defendant of this. Furthermore, defense counsel forfeited his contention that a hearing was required by failing to object pretrial or even during the trial. (See *People v. Miranda* (1987) 44 Cal.3d 57, 77-78 [because the defendant failed to "take any steps during trial to challenge the consolidation of the unrelated counts," "[h]e therefore has waived any objection and may not now claim that there was a misjoinder resulting in prejudice to him"].)

II

*There Was Sufficient Evidence Defendant Touched Doe 3's and Doe 2's Buttocks With The Specific Intent To Achieve Immediate Sexual Arousal As Alleged In Counts 8 and 7*

Defendant contends there was insufficient evidence he touched the buttocks of Doe 3 and Doe 2 with the specific intent to achieve immediate sexual arousal as alleged in count 8 and count 7. Defendant's contention is that since the prosecutor argued in closing that "he was trying to do more and more by th[ose] touching[s]," he was basically "trying to see how far he could go," they were not lewd acts as defined in Penal Code section 288, which requires the specific intent to achieve *immediate* sexual gratification. That the People thought defendant wanted to engage in additional sexual touching

6

beyond grabbing Doe 3's and Doe 2's buttocks does not mean there was insufficient evidence that defendant touched their buttocks intending at the time of these touchings to immediately arouse his own sexual desires. We explain below.

Penal Code section 288, subdivision (a) punishes "any person who willfully and lewdly commits any lewd or lascivious act . . . upon . . . a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." "In all cases arising under th[is] statute, the People are required to prove that the defendant touched the child in order to obtain *immediate* sexual gratification." (*People v. Martinez* (1995) 11 Cal.4th 434, 452, italics added.)

### A

### *Touching Doe 3's Buttocks Three Times*

Defendant touched Doe 3 three times on her buttocks during the summer before she began sixth grade, around the time she was 11 or 12 years old, and there was sufficient evidence that each touch was perpetrated with defendant's intent to obtain immediate sexual gratification. The first was when she was playing by herself on an exercise ball in the living room, and defendant just walked in, patted her on her buttocks, and walked out of the living room. Doe 3 "fe[lt] like it was inappropriate." He then walked back into the living room when she was still alone on an exercise ball and patted her again on the buttocks. The third time (which was separate from the first two), Doe 3 was on a mattress in the living room, where she had been sleeping while staying at their house . While Doe 3 was on the mattress, defendant "touch[ed] [her] . . . in [her] bottom area." From these three touching, Doe 3 "remember[ed] the overall feeling of gross."

All three touchings shared the following common characteristics: (1) defendant touched Doe 3 on an *intimate part* of her body (the buttocks), the location of which tended to show an intent for immediate sexual gratification; (2) defendant picked a time when there was nobody else in the living room, which tended to show his desire to keep

7

his actions a secret from others, indicating an illicit purpose; and (3) defendant had no reason to be in the living room with Doe 3, again indicating an illicit purpose. From these facts surrounding the touchings, there was sufficient evidence defendant did indeed touch Doe 3's buttocks with an intent of immediate sexual gratification.

B

*Grabbing Doe 2's Buttocks Once (Count 7)*

Defendant grabbed the buttocks of his 13-year-old niece, Doe 2, when she was visiting defendant and L.S. in their El Dorado Hills house over Thanksgiving 2011. Just as with count 8, here in count 7 there was sufficient evidence that this touch was perpetrated with defendant's intent to obtain immediate sexual gratification. Before he grabbed Doe 2's buttocks, he removed the only other adult (L.S.) who had been in the living room with them, indicating he was trying to get Doe 2 alone with him. He then lied to Doe 2, telling her he was "going to come back down to talk to [her]." When he returned, he did not talk to her, but instead grabbed an intimate part of her body -- her buttocks -- catching her off guard while she was sleeping on the couch. She pushed defendant away, said, "No," and then locked herself in the bathroom where she called her grandmother to take her home. From these facts surrounding the touching (i.e., defendant setting up a situation where he would be the only adult in the room with Doe 2, lying to her as to why he needed to come back down to see her, and then touching an intimate part of the body), a jury could reasonably conclude defendant did indeed touch Doe 2's buttocks with an intent of immediate sexual gratification.

III

*The Court Correctly Did Not Instruct On An Attempted Lewd Act*

Defendant contends the trial court erred in failing to instruct on an attempted lewd act for counts 7 and 8, and defense counsel was ineffective for not requesting this instruction. We disagree, because there was no evidence that defendant committed only an attempted lewd act. (See *People v. Breverman* (1998) 19 Cal.4th 142, 162 [to warrant

8

instruction on a lesser included offense, there must be evidence from which the jury could conclude that the lesser offense, but not the greater, was committed].)

 " ' " The word 'attempt' means to try; it implies an effort to bring about a desired result.  Hence, an attempt to commit any crime requires a specific intent to commit that particular offense." ' " (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549.)   The crux of defendant's argument about why the attempt instruction was appropriate here is that the "People theorized that in both cases, [defendant] was *not necessarily seeking immediate sexual gratification*, but was testing the victims to see how far he could go, with the intent of engaging in additional lewd touching that would lead to sexual gratification." (Italics added.)  The problem for defendant is that if the jury believed this argument by the People, the crime would not be an attempt.  That is because an attempted lewd touching still requires the specific intent to commit that offense, namely, an intent to seek immediate sexual gratification.   (See *Montes*, at p. 1549.)  So, if there was evidence that defendant was *only* testing the waters to see how far he could go by touching Doe 2 and Doe 3 on the buttocks but did not receive immediate sexual gratification, the touching would not be an attempted lewd act.  Thus, the court was not required to instruct on an attempted lewd act and defense counsel was not ineffective for failing to request this instruction.

IV

*There Was Sufficient Corroboration Of Doe 4's Age*
*To Extend The Statute Of Limitations For Count 9*

Defendant contends his conviction for count 9 (lewd act upon Doe 4 when Doe was 15 that occurred between July 23, 1997 and July 22, 1998) must be reversed because there was insufficient evidence to support the timeliness of the charge.  Specifically, defendant contends there was insufficient evidence to corroborate Doe 4's allegation that the lewd act (intercourse) happened when she was 15 (as opposed to 16 or older).

9

This evidence was necessary, as defendant argues, because the ordinary statute of limitations of three years had expired, and the People had to prove, among other things (and as the jury was instructed), that there was "independent evidence that . . . corroborates [Doe 4]'s allegation."

Doe 4's allegation was that defendant committed a lewd act on her when she was 15, and as noted, her age at the time of the act is what defendant here claims was not corroborated at trial. "When an issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369.) Doe 4 testified that in the spring of 1994 when she was 15 years old, she and defendant had sex for the first time at a hotel in Humboldt County. The independent evidence corroborating Doe 4's age as 15 came from defendant and Doe 1. Defendant testified that he and L.S.'s oldest son was born in 1994, sometime after August 14. Their daughter, Doe 1, testified she was born in 1998. Defendant testified that Doe 1 came to live with them when she was eight days old. Defendant testified that there was some truth to what Doe 4 testified, namely, that he was in the hotel room with Doe 4 and "Louis," but he told Doe 4 he was married, they did not have sex, and it was during 1998 or 1999. On cross-examination, he noted that at the time he met Doe 4, his wife was at home taking care of "Boo-Boo," which was the nickname of their older son. Had this encounter in the motel taken place in 1998 or 1999, as defendant testified, L.S. would have been at home taking care of two young children, not just one. Thus, independent evidence corroborated Doe 4's testimony that she was 15 when defendant committed the lewd act.

Defendant claims this inference is not reasonable, however, because it would have been unreasonable for defendant to have mentioned everyone living in their household to a person he just met. And, in any event, there was a time in 1998 when Doe 1 was not living with defendant and his wife. The problem with these arguments is that they go to the weight of the evidence, which is not something we are concerned with on substantial

10

evidence review.  The fact remains there was evidence in the form of defendant's and Doe 1's testimony (that we have just recounted) from which the jury could have concluded (although it did not have to) that there was corroboration for Doe 4's testimony that she was 15 at the time defendant committed a lewd act on her.

V

*The Court Did Not Err In Excluding Evidence Of Doe 1's Mental Health*

Defendant contends the court denied him due process of law when it excluded evidence that Doe 1 suffered from psychotic symptoms when she came forward with her allegations of sexual abuse against him.  According to defendant, the trial court had "no rational basis for excluding that cross-examination [about the psychiatric symptoms]."

The testimony about Doe 1's mental health symptoms that the court excluded from evidence was as follows.  At a hearing outside the presence of the jury about the admissibility of such evidence, Doe 1 testified that in April 2012 she took a medication called Risperdal for depression.  During that time, she also heard voices that "were just calling out [her] name" but "not anything terrible."  The voices did not tell her to do anything, to say anything, or to take any action.  She believed she had also been diagnosed with multiple personality disorder sometime in 2011 or 2012.  Sometimes she feels like she's a "different version of [her]self."  Usually she is quite timid, shy, and introverted, but "sometimes there[ are] different versions of [her]self that are outgoing and just loud and . . . angry."  She had also been diagnosed with anxiety and posttraumatic stress disorder (PTSD).

The court excluded this evidence because the defense had not proved "what the significance of [Doe 1's answers about her mental health] are."  The court was unaware "if a person with multiple personality disorder is going to necessarily be a liar or not" or "if a person suffering PTSD is going to suffer some consequences that may cause them to be less than truthful or have a bad memory."  The court ruled that "bringing this up in

11

front of the jury and have it hanging, at minimum, is in violation of the Evidence Code section 352." As we explain below, this ruling was correct.

"[T]he mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591-592.) Here, nothing in Doe 1's testimony in front of the court called into question her ability to perceive, recall, or describe the molestation. For example, although she testified she heard voices, nothing in her testimony stated or indicated those voices told her to lie or, as she put it, "take any action." Similarly, with respect to her having multiple personality disorder, she testified she feels like she is a "different version of [her]self" one that is "outgoing and just loud and . . . angry." Again, nothing in this testimony called into question her ability to perceive, recall, or describe the molestation. Finally, the same was true of Doe 1's testimony that she had been diagnosed with anxiety and PTSD. As the court commented, nothing in this testimony about these conditions reflected that "a person suffering PTSD is going to suffer some consequences that may cause them to be less than truthful or have a bad memory." Because there was no testimony or other evidence that Doe 1's mental state was relevant to her credibility, i.e., that it " affect[ed] [her] ability to perceive, recall or describe the events in question" (*Gurule*, at p. 592), the court did not abuse its discretion or violate defendant's right to due process in excluding it.

VI

*The Court Correctly Instructed Pursuant To CALCRIM No. 1191*

*Regarding Evidence Of Uncharged Sex Offenses*

Defendant contends the court erred in giving the standard instruction regarding the use of uncharged sex offenses, CALCRIM No. 1191, because the instruction: (1) allowed the jury to consider Doe 1's testimony regarding the uncharged Texas offenses to corroborate her own testimony about the charged offenses also involving her, an

12

allegedly irrational presumption in violation of state law and federal constitutional law; and (2) diluted the People's burden of proving the charges beyond a reasonable doubt because it allowed the jury to find circumstantial evidence of his guilt based on facts proven only by a preponderance of the evidence.[2]

A

*CALCRIM No. 1191 As It Applied Here Did Not Have An Irrational Presumption*

Defendant first contends that the court erred in giving CALCRIM No. 1191 because the instruction allowed the jury to consider Doe 1's testimony regarding the uncharged Texas offenses to corroborate her own testimony about the charged offenses also involving her. Defendant bases his argument on a line of cases that stand for the proposition that "[w]here the sole evidence of uncharged sexual conduct is the

---

[2]     CALCRIM No. 1191 as given here reads as follows:

"The People presented evidence that the Defendant committed other offenses that were not charged in this case, and you may consider this evidence only if the People have proved it by a preponderance of the evidence that the Defendant, in fact, committed these uncharged offenses.

"Proof by a preponderance of the evidence is a different burden of proof from the proof required beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the Defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the Defendant was disposed or inclined to commit sexual offenses and, based on that decision, also conclude that the Defendant was likely to commit the charged offenses.

"If you conclude the Defendant committed the uncharged offenses, that conclusion is only one factor to consider, along with all the other evidence. It is not sufficient by itself to prove that the Defendant is guilty of the charged offenses. The People must still prove each charge beyond a reasonable doubt."

13

uncorroborated testimony of the prosecutrix herself, it is inadmissible since it contributes nothing to a determination of her credibility on the charged offenses and is highly prejudicial." (*People v. Scott* (1978) 21 Cal.3d 284, 297, citing *People v. Stanley* (1967) 67 Cal.2d 812, 817; accord, *People v. Smittcamp* (1945) 70 Cal.App.2d 741, 745-751.) Here, however, the fundamental concerns raised in *Scott*, *Stanley*, and *Smittcamp* are not present because defendant's conduct against Doe 1 (albeit of the charged offenses) *was* corroborated by third-party evidence. That evidence included the criminalist's testimony that the DNA taken from a swab of Doe 1's left breast contained the enzyme amylase, which was indicative of saliva, and that amylase matched defendant's DNA. That third party evidence also included defendant's own testimony that he told Doe 1 to tell L.S. "yes" in response to L.S. questioning her as to whether defendant had touched her. Thus, we reject defendant's argument that CALCRIM No. 1191 involved an irrational presumption regarding corroboration.

B

*CALCRIM No. 1191 As Given Here*

*Did Not Dilute The People's Burden Of Proof*

Defendant's second argument regarding CALCRIM No. 1191 is it diluted the People's burden of proving the charges beyond a reasonable doubt because it allowed the jury to find circumstantial evidence of his guilt based on facts proven only by a preponderance of the evidence. We reject this claim based on *People v. Reliford* (2003) 29 Cal.4th 1007, in which our Supreme Court upheld the constitutionality of the 1999 version of CALJIC No. 2.50.01, CALCRIM No. 1191's precursor. (See also *People v. Cromp* (2007) 153 Cal.App.4th 476, 480; *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87 [finding 1999 version of CALJIC No. 2.50.01 and CALCRIM No. 1191 similar in all material respects and rejecting constitutional challenges to CALCRIM No. 1191 on the basis of *Reliford*].)

14

Defendant, however, argues that *Reliford* is not applicable here because CALCRIM No. 1191 essentially told jurors that "an inference of likely guilt could be based on evidence established by a preponderance of evidence." The problem with defendant's argument is that CALCRIM No. 1191 as read stated at the end that "[i]f you conclude the Defendant committed the uncharged offenses, that conclusion is only one factor to consider, along with all of the other evidence. It is not sufficient by itself to prove that the Defendant is guilty of the charged offenses. *The People must still prove each charge beyond a reasonable doubt.* (Italics added.)

Defendant further argues that apart from *Reliford*, CALCRIM No. 1191 allowed the jury to find that the independent evidence corroborating Doe 4's allegation of sexual abuse (required to extend the statute of limitations for count 9) could be proved by only a preponderance of evidence, as opposed to clear and convincing evidence, as required by the statute allowing for the extended statute of limitation, Penal Code section 803, subdivision (f)(2)(C). The problem with this argument is that the court gave a pinpoint instruction regarding count 9 that specifically stated the corroboration allegation here had to be proven by clear and convincing evidence. The pinpoint instruction stated: "You must also decide, whether for Count [9], the People have proved the additional allegation that there is independent evidence that clearly and convincingly corroborates the victim's allegation. [¶] Clear and convincing evidence of the corroboration means evidence of such convincing force that it demonstrates, in contrast to the opposing evidence, the high probability of the truth of the facts for which it is offered as proof. Such evidence requires a higher standard of proof than proof by a preponderance of the evidence. . . . [¶] If the People have not met the burden of proving the allegation by clear and convincing evidence, you must find that the allegation has not been proved." There is no reason that the jury would have instead applied CALCRIM No. 1191 regarding uncharged offenses and preponderance of the evidence to count 9 when it had this instruction directly on point.

15

VII

*Defendant's Due Process Right To A Fair And Impartial Judge Was Satisfied*

Defendant contends he was denied his due process right to be sentenced by a judge with no actual or perceived bias against him. His contention is based on his view that "the comments made by the sentencing judge just prior to imposition of sentence admitted an emotional state that was incompatible with a 'dispassionate' exercise of sentencing discretion."

These comments from the judge were as follows: "I'm full of emotion at this point in time. I'm doing my best to keep my equilibrium at a lower rate and not to explode. But the sentence that you're going to receive, I'm convinced now, though debated it before, I'm convinced now that you deserve every day of it. I don't wish you any ill will, but for what you've done to these four ladies and to everyone else around you, shame on you."

" 'A fair trial in a fair tribunal is a basic requirement of due process,' " and " 'the Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.' " (*People v. Freeman* (2010) 47 Cal.4th 993, 1000.) "We determine the propriety of judicial comment on a case-by-case basis in light of its content and the circumstances in which it occurs." (*People v. Cash* (2002) 28 Cal.4th 703, 730.) The content of the judge's comments was he was "full of emotion," was "doing [his] best to keep [his] equilibrium at a lower rate and not to explode," was convinced defendant deserved the sentence he was getting, and expressed shame on defendant for what he had done. Even standing alone, this content does not indicate the judge was unfair or biased or had the appearance of being. It just conveyed that the judge had strong feelings about what he had just heard.

What he had just heard was a defendant who personally addressed the court in a lengthy statement in which defendant said the victims had lied and that the real victims were he and his family. Specifically, defendant told the judge the following: because of

16

these false sexual allegations against him and his pretrial incarceration, his children had been taken away and some had become destitute and homeless, essentially punishing his children in an attempt to further punish him; the allegations against him were racially motivated; he knew he would not be treated fairly because of the color of his skin; and he did not commit any crimes against these girls, except Doe 4, but the People got the year wrong. Despite these comments made by defendant, the judge made a point of saying he "d[id]n't take it lightly at all when [he's] faced with a sentencing of his magnitude," he was "looking over the probation report . . . debating . . . whether or not some counts should be run concurrent so that [defendant's] sentence would be shorter than [probation] recommended," and "[i]t's not easy to have this kind of authority" and he does not "take it lightly." Given these circumstances and the content of the judicial comment, the record makes clear that the judge determined defendant's sentence on the law and reason and was not biased against defendant and did not appear to be. There was no due process violation.

## VIII

*Only One Indeterminate Life Sentence Was Permissible As To Counts 1 And 2,*
*Because The Counts Occurred Against A Single Victim On The Same Occasion*

Defendant contends (and the People concede) the trial court erred in sentencing defendant to two terms of 15 years to life in prison under the one strike law (Pen. Code, § 667.61) (which was then doubled to 30 years to life under the three strikes law). The court's sentence as to the one strike law was error because the version of the one strike law in effect at the time counts 1 and 2 were committed (between September 8, 2004 and September 7, 2006) prohibited imposing more than one life term for offenses committed against a single victim on a single occasion. (Stats. 2006, ch. 337, § 33, pp. 2165-2167; *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1307.) Here, as proven at trial, count 2 was when defendant touched Doe 1's vagina with his hand in the laundry room when she was six years old and then during the same incident, count 1 was when defendant

17

penetrated Doe 1's buttocks with his penis.  As these counts were against one victim on one occasion, we strike the 15-to-life sentence in count 2 imposed under the one strike law.

IX

*The True Findings For The Strike Prior And Prior Prison Term Enhancement Must Be Reversed  And The Matter Remanded For A Court Trial On These Allegations*

Defendant contends (and the People concede) the trial court erred in finding true and then imposing a sentence for a strike prior under the three strikes law and a three-year prior prison term enhancement, both based on defendant's alleged 1994 conviction for involuntary manslaughter, because there was a failure of proof.  We explain below.

The information alleged defendant had a strike prior under the three strikes law and had served a prison term based on a 1994 conviction for "[i]nvoluntary [m]anslaughter -- [u]sed [f]irearm."  Defendant waived his right to a jury trial on this allegation.  The court then read the allegation to him that in June 1994, he "was convicted of a violent felony, to wit, involuntary manslaughter with the use of a firearm . . . .  And that you thereafter served a separate prison term of one year or more for the offense . . . . [¶]  You did not remain free of custody for and did commit an offense resulting in a felony conviction during a period of ten years subsequent to the conclusion of said term."  Defendant responded, "I admit I had a conviction."

What was lacking in defendant's admission for purposes of the court using that admission to find true the strike prior was an admission that during the involuntary manslaughter, he "personally inflict[ed] great bodily injury on any person, other than an accomplice, or . . . personally use[d] a firearm,"  which would have then qualified the involuntary manslaughter conviction as a strike.  (Pen. Code, § 1192.7, subd. (c)(8).)  This was necessary because an involuntary manslaughter conviction standing alone does not qualify as a strike.   (*People v. Brown* (1988) 201 Cal.App.3d 1296, 1303.)

18

What was lacking in defendant's admission for purposes of the court using that admission to find true the prior prison term enhancement was both (1) that during the involuntary manslaughter, defendant "inflict[ed] great bodily injury on any person other than an accomplice . . . or any felony in which the defendant use[d] a firearm . . . ." (Pen. Code, § 667.5, subd. (c)(8)); and (2) that he served a prison term prior to a period of 10 years in which he did not "remain[] free of both prison custody and the commission of an offense which results in a felony conviction" (Pen. Code, § 667.5, subd. (a)).

Thus, the court erred in doubling for all counts defendant's sentence because of the alleged strike and adding a three-year enhancement because of his alleged prior prison term.

The remedy for the court's error is to reverse these true findings, strike the additional punishment, and allow the People to retry these allegations, if they choose. (See *People v. Monge* (1997) 16 Cal.4th 826, 845 [retrial of a prior conviction allegation is not barred by double jeopardy].)

X

*The Abstract Of Judgment Must Be Amended*

*To Reflect The Correct Year Each Count Occurred*

Defendant contends (and the People concede) the court erred by listing in the abstract of judgment "2012" as the year every count was committed.

The abstract of judgment must be amended to reflect the actual years the crimes were committed, which here were as follows:  count 1:  2004-2006; count 2:  2004-2006; count 3:  2004-2006; count 4:  2011-2012; count 5:  2012; count 6:  2012, count 7:  2011; count 8:  1997; count 9:  1997-1998.

DISPOSITION

As to count 2, the indeterminate term of 15 years to life is stricken.  As to all counts, the three strikes term (doubling each of the sentences for each of the counts) and prior prison term finding and sentence (three consecutive years) is stricken.  The case is

19

remanded for a court trial on the three strikes allegation and the prior prison term allegation, if the People so choose. After resentencing, the court must forward to the Department of Corrections and Rehabilitation an amended abstract showing defendant's new sentence and the correct dates of his crimes.

/s/

Robie, J.

We concur:

/s/

Blease, Acting P. J.

/s/

Hoch, J.